UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| 1ST HOME LIQUIDATING TRUST, et al., ) | |
| Plaintiffs, ) | |
| v. ) | No. 95-205\ (Senior Judge Smith) |
| THE UNITED STATES, ) | |
| Defendant. ) | |

**MOTION FOR LEAVE TO CITE SUPPLEMENTAL AUTHORITY IN SUPPORT OF THE GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND TO ISSUE A DECISION ON THE PENDING CROSS MOTIONS OR, IN THE ALTERNATIVE, TRANSFER THE CASE FOR DECISION BY ANOTHER JUDGE**

Pursuant to Rules 7(b) and 40.1 of the Rules of the Court of Federal Claims, and the Omnibus Case Management Order ("CMA") dated September 18, 1996, defendant, the United States, respectfully seeks leave to supplement the authorities cited in support of its cross-motion for summary judgment on liability and "money-back" restitution with the recent decision of the Court of Appeals for the Federal Circuit in Caroline Hunt Trust Estate v. United States, Nos. 05-5141 and 5179 (Slip Op., Nov. 16, 2006) (Attachment). Further, we respectfully seek a ruling concerning the pending cross-motions for summary judgment and defendant's motion to dismiss the complaint, fully briefed and pending for decision since October 2003. In the alternative, we respectfully request the case be transferred to another Judge who may have more time to devote to this matter.

## I. MOTION FOR LEAVE TO CITE SUPPLEMENTAL AUTHORITY

Our cross-motion for summary judgment on liability demonstrates that there is no evidence in the trial record of a contract between the Federal Home Loan Bank Board

("FHLBB"), 1st Home Federal Savings & Loan of the Carolinas ("1st Home Federal"), and the investors for the long-term amortization of goodwill or to count goodwill in the calculation of regulatory capital. See Opposition To Plaintiffs' Motion For Summary Judgment On Liability And Money Back Restitution; Cross-Motion For Summary Judgment On Liability And Money Back Restitution; And Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted, August 18, 2003, at 25-36 ("Government's Opposition and Cross Motion").

Plaintiffs, 1st Home Liquidating Trust ("1st Home Trust") and the Trustees, concede in their motion for summary judgment on liability and "money-back" restitution that there is no evidence of the existence of a written contract between the FHLBB and 1st Home Federal or the investors concerning the long-term amortization of goodwill or its inclusion in regulatory capital. Plaintiffs argue, however, that the application for conversion presented to the FHLBB by 1st Home Federal and the investors constituted an "offer" by 1st Home Federal and the investors to invest approximately $32 million in 1st Home Federal in return for the FHLBB's commitment to allow goodwill to count as regulatory capital. According to plaintiffs, the FHLBB accepted the offer by approving the transaction, and each party received reciprocal consideration: the FHLBB received the benefit of the capital infusion of the investors, and the thrift and investors received the benefit of the guaranteed long-term amortization of goodwill.

We explained previously that the application by 1st Home Federal and the investors does not present an "offer" to provide funds to the thrift in return for purchase method accounting but, instead, simply references goodwill in the business plan attached to the application. Thus, there was no "contract" between the FHLBB, 1st Home Federal and the investors. See, e.g., Government's Opposition and Cross Motion at 25-36. The recent panel decision in Caroline

Hunt Trust confirms this analysis. While the panel decision wrongly concludes that an "overarching contract" exists between the holding company and the FHLBB, that decision confirms the non-existence of a contract in this case.

In Caroline Hunt Trust, because there was an Assistance Agreement between the thrift and the Federal Savings and Loan Insurance Corporation ("FSLIC"), we contended that there could not have been a separate contract between the holding company and the FHLBB. While this position was rejected, the panel's discussion, consistently with previous decisions, demonstrates the need for an explicit offer for there to be a contract. As we have previously explained, no such offer exists in this case.

For example, in Caroline Hunt Trust, the panel held that, in a series of offers extended between October 1987 and March 1988, Southwest Savings Association ("SSA") consistently conditioned the acquisition of a group of insolvent thrifts upon a $307.5 million capital credit. The holding company, in its application for approval, explicitly referenced SSA's offer. Slip Op. at 9. The panel found that the "FHLBB resolutions . . . authorized FSLIC to execute the Assistance Agreement and granted a $307.5 million capital credit to be used to determine post-merger SSA's regulatory compliance under both existing and future regulations." Slip Op. at 4. The panel also noted that the "legal opinion by FHLBB's Corporate and Security Division described the transaction sequence as an application by [Caroline Hunt Trust] to acquire control [and the] . . . offer included the $307.5 million capital credit . . . . " Slip Op. at 9.

This evidence of offer and acceptance, as described in Caroline Hunt Trust, does not exist in this case. The application submitted by 1st Home Federal and a representative of the investors simply states that it is an "application for voluntary supervisory conversion . . . [which]

contemplates the supervisory conversion of 1st Home Federal from a federally chartered mutual savings and loan association to a federally chartered stock savings and loan association . . . ." Appendix Of Exhibits To Plaintiffs' Motion For Summary Judgment On Contract Liability And Money-Back Restitution For Breach Of Contract ("Plaintiffs' Appendix") at 29. The application states that "no financial assistance . . . is requested" and further that the only regulatory forbearances being requested are those "described below." Id.

The request for regulatory forbearance seeks a commitment from the FHLBB that, under Generally Accepted Accounting Principles ("GAAP"), if the thrift is unable to comply with the regulatory capital requirements, the FHLBB will allow a recomputation under Regulatory Accounting Principles ("RAP"), i.e., will allow the amortization of deferred losses. Id. at 32. There is no request for a forbearance relating to the amortization of goodwill or including goodwill in the calculation of regulatory capital.

To the contrary, the only reference to goodwill is contained in the business plan which describes purchase method accounting and asserts that "the resulting goodwill [will be] amortized over 30 years and the discount accreted to income using the level yield method." Id. at 192. However, the business plan simply describes the nature of the accounting. Unlike in Caroline Hunt Trust, it fails to propose a particular regulatory treatment for goodwill.

Likewise, the approval resolution fails to contain evidence of contractual intent. That resolution notes that, "whereas 1st Home Federal . . . has filed . . . for permission to convert from a federally chartered mutual association to a federally chartered stock association . . . it is resolved that . . . 1st Home is hereby authorized to convert from the federal mutual to the federal stock form in accordance with the terms of the Application . . . ." Id. at 434-35. This language

does not suggest that the FHLBB regarded 1st Home Federal's application to be an "offer"or that it was accepting an "offer" by approving the transaction.

Plaintiffs contend that the reference to "in accordance with the terms of the Application" suggests an intent by the FHLBB to "accept" 1st Home Federal's "offer" to contract. However, this is only logical if the application indicates an "offer" to contract. As we have demonstrated, however, it does not. See, e.g., Anderson v. United States, 344 F.3d 1343, 1357 (Fed. Cir. 2003) (a statement in the approval resolution that the conversion will occur "in accordance with the terms of the amended plan of supervisory conversion contained in the application . . . falls short of the language of manifest assent to the terms of a contract . . . .").

Finally, there is no evidence in the FHLBB's staff's treatment of the application to indicate that the conversion was conditioned upon a specific regulatory treatment of goodwill. In the initial digest, the supervisory agent merely notes that the conversion will "involve the recognition of at least $48 million in goodwill through the use of push-down accounting." Plaintiffs' Appendix at 387. The reference to goodwill is limited to a description of the accounting proposed for the transaction. The supplemental issues memorandum likewise mentions goodwill only in the context of the amount the FHLBB considered likely to be generated through the application of its viability model. Plaintiffs' Appendix at 396-97.

Nor is there any indication that the supervisory agent considered a specific regulatory treatment of goodwill as a condition of the transaction. The supervisory agent confirmed his understanding of the role of supervisory goodwill in the transaction in a declaration dated December 15, 1999:

> I did not consider the application (and the accompanying business plan) to be an offer

> to contract, or to be a request that the Bank Board enter into a contract with 1st Home (or its investors) concerning the future regulatory treatment of goodwill. . . On several occasions, I discussed the application with individuals representing 1st Home, including Jim Melvin, the thrift's CEO, and Ray Tiernan, the thrift's lawyer. At no time did anyone representing 1st Home ever state to me, or anyone else, as far as I know, that 1st Home considered its application (and accompanying business plan) to be an offer to contract, or to be a request that the Bank Board enter into a contract concerning the future regulatory treatment of goodwill.

Appendix To Opposition To Plaintiffs' Motion For Summary Judgment On Liability And Money Back Restitution; Cross-Motion For Summary Judgment On Liability And Money Back Restitution; And Motion To Dismiss For Failure To State A Claim Upon Which Relief Can Be Granted ("Defendant's Appendix") at 49.

In short, as we demonstrated in our Opposition and Cross-Motion and as is substantiated by the panel's discussion of the elements of offer and acceptance in Caroline Hunt Trust, there is no evidence 1st Home Liquidating Trust, the investors, and the FHLBB formed a contract. Accordingly, our motion for summary judgment on liability should be granted and plaintiffs' cross-motion should be denied.

## II. THIS COURT SHOULD PROMPTLY RULE UPON THE PENDING MOTIONS AND, IF NECESSARY, SET A TRIAL DATE OR, IN THE ALTERNATIVE, TRANSFER THE CASE TO ANOTHER TRIAL JUDGE

Only approximately 15 Winstar-related cases remain to be litigated in this Court and the Government wishes expeditiously to complete the litigation. As far as we are aware, this is one from the first group of 30 cases activated for discovery that has not even completed discovery. The facts and evidence relevant to the claims and defenses in this case are approximately 20

years old. Witnesses are becoming unavailable and their memories are fading. This is one of very few, if any, phase one cases that remain to be litigated. Therefore, it is important that the case be resolved as promptly as possible.

Pursuant to ¶ 5 of the CMA, plaintiffs initially filed a motion for summary judgment on liability on April 2, 1998, and a motion for summary judgment on restitution (the only damage sought in the complaint) on April 3, 2000. On September 17, 1999 and May 12, 2000, the Government filed respective cross-motions. Briefing was completed in October 2000. In May 2003, after almost a three-year delay, this Court denied the motions and ordered the parties to file updated motions focusing upon the newly-issued case law. The parties did so on July 14 and August 18, 2003, respectively. On October 16, 2003, this Court entertained oral argument on the cross-motions. As of now, another three years later, there has been no ruling on the cross-motions.

This Court, having heard oral argument on the pending motions, is in the best position to resolve the motions and, if necessary, schedule the case for trial. Because Winstar-related issues are now familiar to many other Judges as well, however, another Judge could become familiar with the record if this Court cannot rule upon the dispositive motions. If a ruling is not possible in the near future, given the length of time the motions have been pending, we respectfully request that the case be reassigned. The power to transfer the case exists under the CMA, which provides, in relevant part: "The Managing Judge may assign specific matters or cases to another Judge or Judges of this Court for resolution." ¶ 2.C, CMA. Moreover, pursuant to Rule 40.1(b), RCFC, "to promote docket efficiency, to conform to the requirements of any case management plan, or for the efficient administration of justice, a case may be transferred by order of the

assigned judge to another judge upon the agreement of both judges."

In short, this case has now been pending for over 11 years, and the dispositive motions have been awaiting decision for over three years. As far as we are aware, with the exception of the claims asserted in this action, the voluntary liquidation of the assets and liabilities of 1st Home Federal, which was begun in 1993, is now complete; the only matter preventing completion of the liquidation is this case. It is in the interests of all parties to the liquidation proceeding and this case that this matter be promptly resolved. Accordingly, we respectfully request a prompt decision on the pending motions and the scheduling of a trial date if necessary or, in the alternative, a reassignment to another Judge.

**CONCLUSION**

For these reasons, we respectfully request that our motion for leave to file supplemental authority be granted, that this Court issue a prompt decision on the pending motions or, in the alternative, that this Court transfer the matter to another Judge for resolution.

Respectfully submitted,

STUART E. SCHIFFER
Deputy Assistant Attorney General

s/David M. Cohen

DAVID M. COHEN
Director

JEANNE E. DAVIDSON
Deputy Director

WILLIAM F. RYAN
Assistant Director

s/David A. Levitt

DAVID A. LEVITT
Trial Attorney
Commercial Litigation Branch
Civil Division
Department of Justice
1100 L Street, N.W., Rm. 11138
Washington, D.C. 20005
Tel: (202) 307-0309
Fax No.: (202) 514-7965

Attorneys for Defendant

December 15, 2006

# ATTACHMENT

# United States Court of Appeals for the Federal Circuit

05-5141, -5179

CAROLINE HUNT TRUST ESTATE,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

Rosemary Stewart, Spriggs & Hollingsworth, of Washington, DC, argued for plaintiff-cross appellant.

Kenneth M. Dintzer, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, United States Department of Justice, of Washington, DC, argued for defendant-appellant. With him on the brief were Stuart E. Schiffer, Deputy Assistant Attorney General, David M. Cohen, Director, Jeanne E. Davidson, Deputy Director, and Arlene Pianko Groner, Trial Attorney. Of counsel were Scott Austin and Elizabeth M. Hosford, Trial Attorneys.

Appealed from: United States Court of Federal Claims

Senior Judge James F. Merow

# United States Court of Appeals for the Federal Circuit

05-5141, -5179

CAROLINE HUNT TRUST ESTATE,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

---

DECIDED: November 16, 2006

---

Before NEWMAN, GAJARSA and LINN, Circuit Judges.

Opinion for the court filed by Circuit Judge LINN. Circuit Judge GAJARSA dissents.

LINN, Circuit Judge.

The United States appeals from the judgment of the Court of Federal Claims, holding that the government breached its contract with Caroline Hunt Trust Estate ("CHTE") and awarding $14,847,100 in damages to CHTE. Caroline Hunt Trust Estate v. United States, 65 Fed. Cl. 271 (2005) ("CHTE") (Case No. 95-CV-531). The breach was the elimination of the regulatory capital by the enactment of the Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA"), Pub. L. No. 101-73, 103 Stat. 183. CHTE cross-appeals from calculation of the damage award. Because the trial court properly determined the existence of a contract between CHTE and the government and properly computed the offset to damages arising from CHTE's

release from its obligations under its net worth maintenance ("NWM") letters, we affirm as to these issues. CHTE's recovery of the value of its $2,279,700 in equity in Southwest Savings Association ("SSA"), however, is foreclosed by our recent decision in American Capital Corp. v. United States, Nos. 05-5150, -5152, -5159 (Fed. Cir. Oct. 30, 2006), and we reverse as to that issue. Accordingly, the award of damages to CHTE must be reduced to $12,567,400, and we remand to the Court of Federal Claims with instructions to enter judgment for CHTE in that amount.

I. BACKGROUND

CHTE is an irrevocable trust, with Caroline Hunt as the sole beneficiary. In 1972, CHTE acquired majority ownership of SSA, a Texas-chartered, federally regulated savings and loan association. Donald Crisp ("Crisp") was the trustee who administered CHTE with a three-person advisory Board of which he was a member. From 1986 to June 1990, Todd Miller ("Miller") was president, chief executive officer, and a director of SSA. Between 1980 and 1990, CHTE held more than 90% of SSA's stock and controlled its Board of Directors. In 1983 and 1986, CHTE executed NWM letters, committing it to ensure that SSA met its minimum statutory reserve and net worth obligations. Further, prior to the 1988 acquisitions that are the subject of this appeal, CHTE infused capital into SSA, and acquired subordinated debt, which, as of May 18, 1988, had an outstanding balance of $23,780,462.06 owed to CHTE.

Prior to the enactment of the FIRREA, the Federal Home Loan Bank Board ("FHLBB") was responsible for regulating all savings and loan associations. Thrift savings accounts were insured by the Federal Savings and Loan Insurance Corporation ("FSLIC"). These entities were independent agencies of the United States, though the

FHLBB served as the operating head of the FSLIC.

1. The Acquisition Transaction

In response to the savings and loan crisis[1] of the 1980s, FHLBB and FSLIC sought private investors and healthy thrifts to take over ailing thrifts. As an incentive to engage in such mergers, FSLIC and FHLBB routinely agreed to afford the acquiring thrifts particular regulatory treatment. See S. Cal. Fed. Sav. & Loan Assoc. v. United States, 422 F.3d 1319, 1324 (Fed. Cir. 2005).

On October 16, 1987, Miller proposed that, with federal assistance, SSA acquire three[2] troubled Texas thrifts, and proceeded to negotiate the terms of the acquisition. In the midst of these negotiations, FHLBB formulated the "Southwest Plan," under which a cluster of thrifts were proposed for acquisition. The goal of the Southwest Plan was to consolidate troubled Texas thrifts under well-qualified management. FHLBB/FSLIC solicitation material for the Southwest Plan outlined available government assistance, including capital loss coverage, yield maintenance, and a FSLIC note in the amount of the negative net worth of an acquired institution. Regulatory forbearances and specific accounting treatments could be requested, but were not automatically granted, and FSLIC could require an equity share in the resulting thrift.

On March 1, 1988, a Request for Proposals was disseminated by the government, to which SSA responded with a proposal dated March 30, 1988. SSA was subsequently determined suitable. FHLBB resolutions of May 18, 1988 contain the terms of the acquisitions as finally negotiated and approved. The FHLBB resolutions

---

[1] These background facts are discussed in considerably more detail in United States v. Winstar Corp., 518 U.S. 839, 848-49 (1996).

[2] While the initial proposal was to acquire three, the number evolved to twelve and then fifteen; four thrifts were ultimately acquired. CHTE, 65 Fed. Cl. at 277.

recited that (1) FSLIC would be appointed as receiver for each respective thrift; (2) CHTE was the holder of 90% of the common stock of SSA, the "Assuming Association;" and (3) CHTE and SSA, defined as "the Applicants," had applied for approval to acquire control of the respective thrifts. CHTE, 65 Fed. Cl. at 283. FHLBB resolutions further included consideration of proposed FSLIC agreements, including the Assistance Agreement, "pursuant to which the FSLIC in its corporate capacity will provide financial assistance and certain indemnifications to the Assuming Association to facilitate the Acquisition." Id. The FHLBB resolutions authorized the execution of appropriate documents and granted the regulators the authority to decide which applicant, CHTE or SSA, would sign necessary documentation.

The FHLBB resolutions preapproved certain future debts of CHTE, preapproved certain CHTE affiliated transactions, authorized FSLIC to execute the Assistance Agreement, and granted a $307.5 million capital credit to be used to determine post-merger SSA's regulatory compliance under both existing and future regulations. Further, the resolutions released CHTE from its obligations under its NWM letters. In particular, the resolutions recited that SSA required as a condition to entering into the various agreements that CHTE be released from any obligation to maintain SSA's net worth. It was likewise a condition of FSLIC entering into the Assistance Agreement "that the $25 million of subordinated debt of the Assuming Association to the Hunt Trust be converted into equity capital." Id. at 284.

Pursuant to the FHLBB resolutions, a myriad of agreements were signed. FSLIC was appointed receiver for the four insolvent thrifts and transferred ownership interests in the four thrifts to SSA. FSLIC and SSA signed the Assistance Agreement, which

conditioned FSLIC's obligations thereunder in part on (1) the subdebt contribution and addition to SSA's equity capital; (2) SSA's issuance of preferred stock to FSLIC; and (3) issuance of warrants to FSLIC to acquire 382,247 shares of SSA's common stock. Id. The subordinated debt was contributed by CHTE to SSA's equity capital. SSA issued preferred stock certificates, which granted FSLIC the then-vested right to 90% of the first $60 million of the post-merger SSA's earnings. Under a warrant agreement, SSA also granted FSLIC the right to purchase 382,247 shares of common stock—the right to acquire 50% of the stock of the post-merger SSA in ten years. As a result, CHTE's 94% interest in SSA could be literally cut in half.

In sum, CHTE's subsidiary SSA acquired four deeply insolvent Texas thrifts. Subsequent to approval of CHTE's May 18, 1988 H-(e)3 application, the four thrifts were placed into federal receivership and their assets and certain liabilities were conveyed to SSA. FSLIC's financial assistance and incentive for the transaction included, inter alia, a $307.5 million capital credit. Less than two years later, FIRREA caused the elimination of this credit, which led to the liquidation of SSA. Id. at 276.

2. Proceedings Before the Court of Federal Claims

CHTE filed suit in the Court of Federal Claims, alleging that the passage of FIRREA and elimination of the $307.5 million capital credit was a material breach of its contract with the government. After extensive pre-trial proceedings, a four-week trial, and supplemental filings, the court concluded that a contract existed between CHTE and the government, and that the enactment of FIRREA resulted in a breach of the contract. Specifically, the court found that CHTE's H-(e)3 application was a contractual offer to use its subsidiary thrift, SSA, to acquire four failing thrifts, in return for various

incentives, including a $307.5 million capital credit. CHTE, 65 Fed. Cl. at 294. The court further found that there was acceptance by the government, as evidenced from FHLBB resolutions containing the terms of the acquisitions as finally negotiated and approved, the release of the NWM letters, extension of the $307.5 million capital credit, and other forbearances negotiated and agreed upon; together, this amounted to "something more" than boilerplate regulatory approval by the government. Id. at 295-96. Finally, the court found that consideration was exchanged in this mutual agreement between a holding company that contributed SSA and the government that sought to rescue the failing thrifts and preserve FSLIC insurance funds. Id. at 296.

In computing damages, CHTE sought to recover the value of the hard assets it contributed to the transaction, including the contribution of its subdebt to SSA and its equity interest in SSA. The government argued that CHTE's contributions were not required by the contract because they were merely conditions precedent to the acquisitions, and the net value of the CHTE's subdebt contribution was zero because CHTE traded its subdebt for the release of the NWM letters. The court rejected the government's arguments, finding that CHTE's contribution was required by the contract, the value of its subdebt contribution was $21,700,000, and the value of its equity in SSA was $2,279,700. The court discounted this damage award by the value to CHTE from the release of the obligations under the NWM letters—$9,132,600—for a total damage award of $14,847,100. CHTE, 65 Fed. Cl. at 330.

The government appeals the judgment of the Court of Federal Claims, alleging that CHTE lacks standing and challenging the damage award based on SSA's equity and CHTE's release from its NWM letters. CHTE cross-appeals the offsetting damages

calculation, arguing its release from the NWM letters had no monetary value. We have jurisdiction under 28 U.S.C. § 1295(a)(3).

## II. ANALYSIS

We review the Court of Federal Claims' conclusions of law without deference. Comtrol, Inc. v. United States, 294 F.3d 1357, 1362 (Fed. Cir. 2002). We review the court's findings of fact following trial under the clearly erroneous standard. Home Savs. of Am. v. United States, 399 F.3d 1341, 1347 (Fed. Cir. 2005). The existence of a contract is a mixed question of law and fact. La Van v. United States, 382 F.3d 1340, 1345 (Fed. Cir. 2004). The general type of damages to be awarded, their appropriateness, and rates used to calculate damages are reviewed for clear error. Id. "A finding is 'clearly erroneous' when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." United States v. U.S. Gypsum, 333 U.S. 364, 395 (1948).

### 1. Standing

The government asserts that CHTE does not have standing to sue, arguing that the Court of Federal Claims erred in concluding that there is an overarching contract between CHTE and the government. The government argues that there can be no overarching contract because it merely duplicates the terms of the Assistance Agreement. The government further asserts that our decision in Southern California Federal Savings & Loan Ass'n v. United States, 422 F.3d 1319 (Fed. Cir. 2005) ("SoCal"), precludes finding an overarching contract in this case. Finally, the

government argues that there is no evidence supporting the formation or existence of an overarching contract between CHTE and the government.

CHTE responds that the court correctly concluded that CHTE and the government entered into a contract. Specifically, CHTE argues that the court properly determined that the requirements for contract formation—offer, acceptance, consideration, and government authority to bind the government—were satisfied. Finally, CHTE asserts that our decision in Home Savings is dispositive to this issue.

We affirm the Court of Federal Claims' conclusion that CHTE was in privity of contract with the government and could therefore recover damages as a result of the government's breach. The exchanges between the government and CHTE "constitute a contract only if three elements are met: mutual intent to contract including an offer and acceptance, consideration, and a government representative who had actual authority to bind the government."[3] La Van, 383 F.3d at 1346.

The government argues that the trial court erred in concluding that there was mutual intent to contract. We disagree. The trial court, taking into consideration the

---

[3] We emphasize that the inquiry is whether a contract existed between the government and CHTE. Because we conclude that there was, CHTE has standing to sue for breaches of that contract, without regard to the corporate relationship between CHTE and SSA or to the contractual relationship between SSA and the government. The dissent's criticism that we "deny the existence of a legal differentiation between a corporation and its shareholder," Dissenting Op. at 10, is therefore misplaced. CHTE does not have standing to sue as a shareholder for a breach of the Assistance Agreement, but it does have standing to sue in its own right as a party to its own separate contract.

For the same reason, the dissent errs when it concludes that the Entire Agreement and Sole Benefit clauses of the Assistance Agreement preclude a suit by CHTE for breach of its own separate contract. See Dissenting Op. at 7-8. The Assistance Agreement is the entire agreement between SSA and the government, and SSA is the sole beneficiary of that agreement, but these facts have no bearing on the independent contractual relationship between CHTE and the government.

testimony presented at trial, all the relevant resolutions, agreements, and implementing documents, properly found that "in its H-(e)3 Application, CHTE made an offer to the government to acquire troubled thrifts through the vehicle of its subsidiary SSA, and that offer included the $307.5 million capital credit that was subsequently eliminated by FIRREA." CHTE, 65 Fed. Cl. at 294. The H-(e)3 application identifies CHTE as the "applicant" and SSA as its subsidiary. The application further references SSA's proposal dated March 7, 1988, requesting forbearances and waivers noted to have been previously filed.

Moreover, the trial court's conclusion that the H-(e)3 application was the requisite offer by CHTE is further supported by the analyses and recommendation packages that were presented to FHLBB from subagencies. In particular, a legal opinion by FHLBB's Corporate and Security Division described the transaction sequence as an application by CHTE to acquire control, with FSLIC assistance, of the four insolvent thrifts. The acquisition was described as a merger of the insolvent thrifts into CHTE's wholly-owned subsidiary, SSA. The legal opinion states in relevant part that "[t]he Caroline Hunt Trust Estate (the 'Acquiror' and 'Trust'), proposes to acquire control of substantially all the assets and certain liabilities of [the four insolvent thrifts] (collectively the 'Target Institutions') through the following steps." Finally, the offer included the $307.5 million capital credit as evinced by Miller's request for the capital credit in each proposal sent to FHLBB beginning in October, 1987, including the March 7, 1988 proposal referenced in the H-(e)3 application. See Home Savs., 399 F.3d at 1348-49 ("The Resolutions recognized that the 'offer' that led to the contract was [the holding company's] application for regulatory approval of [the subsidiary's] purchases . . . .").

We are not persuaded by the government's argument that the H-(e)3 application could not have been an offer to enter into a contract because it included a footnote stating that the application was solely for the purpose of obtaining approval of the transaction. As the trial court explained, "[t]he footnote warned that the Application should not be construed as an admission that [CHTE] was a savings and loan company, a premise that was then, but no longer, in dispute." CHTE, 65 Fed. Cl. at 294.

This court's precedent on contract formation in the context of Winstar litigation requires that "the offeree must give in return for the offeror's promise exactly the consideration which the offeror requests and acceptance must be made absolutely and unqualifiedly." La Van, 382 F.3d at 1347 (quoting Anderson v. United States, 344 F.3d 1343, 1357 (Fed. Cir. 2003)). In this case, the FHLBB resolutions, the release of the NWM letters, the extension of the $307.5 million capital credit, and the other forbearances negotiated and agreed upon, collectively evidence the requisite acceptance of CHTE's offer. The trial court properly analogized the facts of this case to those in La Van in stating that the documents and the facts and circumstances surrounding the transaction evidenced "'something more', that is, the recognition that the government was engaged in negotiations about the terms of the [acquisition] as well as the subsequent manifest assent to abide by the Resolution[s] required under [this court's precedent]." CHTE, 65 Fed. Cl. at 295 (quoting La Van, 382 F.3d at 1357).

The trial court supported its conclusion that CHTE and the government entered into an overarching contract with a number of factual findings. In particular, the trial court found that "FHLBB knew [CHTE] held over 90% of SSA's stock and controlled the Board of Directors." Id. at 287. The court further found that "the government was

informed that CHTE was a party principal and that negotiations, as well as the ultimate agreement, included terms that only CHTE could provide." Id. at 291. The trial court further explained that "only the FHLBB could release [CHTE from the NWM letters]." Id. at 279. Thus, while FSLIC and SSA signed the Assistance Agreement, FHLBB and CHTE made all the decisions. We discern no clear error in the trial court's factual findings. These factual findings, predicated upon the voluminous documents, testimony, and facts and circumstances surrounding the acquisitions, lead to the conclusion that a bargained-for exchange occurred between the government and CHTE. See Hometown Fin., Inc. v. United States, 409 F.3d 1360, 1365 (Fed. Cir. 2005) ("Whether a bargained-for exchange occurred depends on the surrounding factual circumstances.").

Taking into consideration the overall nature of the transaction, we reach the same conclusion as the trial court—a ten year partnership between CHTE and the government was formed; CHTE allowed SSA to acquire four troubled thrifts, contributed over $23 million in subdebt, and relinquished a significant interest in the profits and equity of post-merger SSA, all for the opportunity to be a 50% shareholder of a much larger merged institution. In return, the government extended financial assistance including a $307.5 million capital credit, and avoided the cost of liquidating these four thrifts. At the end of the ten years, the government would be a 50% owner of a hopefully successful financial enterprise and have a preferential right to its profits.

This court's decision in SoCal, denying standing to a shareholder, is distinguishable from this case. In SoCal, we held that individual shareholders who owned stock in the acquiring holding company, SoCal Holdings, Inc. ("SCH"), did not

have standing. SoCal, 422 F.3d at 1333. In the present case, however, the status of CHTE is more akin to SCH than to the individual shareholders in SoCal. Unlike the individual shareholders in SoCal, here CHTE was critical to the acquisition of the failing thrifts because "it was a condition of FSLIC entering into the Assistance Agreement that the $25 million of subordinated debt of [SSA] be converted into equity capital." CHTE, 65 Fed. Cl. at 284; see also id. at 288 ("[CHTE's] ownership interest in SSA could not have been diluted without [CHTE's] agreement."); id. ("CHTE provided material consideration for the acquisitions, subordinated notes and the stock warrants.").

The trial court correctly analogized the facts of this case to those in this court's decision in Home Savings. In Home Savings, the holding company, like CHTE in the present case, did not sign the Assistance Agreement, but initiated the negotiation process by seeking FHLBB approval for the transactions. See 399 F.3d at 1346. In Home Savings, the holding company agreed to maintain the net worth of the resulting institution.[4] Here, CHTE agreed to and did contribute subdebt and stock warrants in the newly expanded SSA. In exchange, the government extended, inter alia, $307.5 million in capital credit. Thus, there was an exchange of reciprocal promises that were part of the overall bargains between CHTE and the government. Id. at 1349 ("[T]he

[4] There is therefore nothing "conflicting" about SoCal and Home Savings. See Dissenting Op. at 7. They simply present different facts. In SoCal, a group of investors jointly formed a holding company that entered into a number of agreements with the government to acquire a failing thrift. SoCal, 422 F.3d 1325-26. The investors themselves had no separate negotiations with the government and lacked standing to sue on behalf of the corporation they owned. Id. at 1333. In contrast, the Home Savings holding company—like CHTE here—made an offer that was accepted by the government, which in turn entered into "mutual, reciprocal obligations" with the holding company. Home Savings, 399 F.3d at 1349.

The two cases that cannot readily be distinguished from one another on their facts are Home Savings and the instant case.

Resolutions contain reciprocal promises that were part of the overall bargains between the plaintiffs and the government.”).

For these reasons, we uphold the trial court’s determination that CHTE was in privity of contract with the government and therefore has standing to assert claims for breach.[5]

2. NWM Release Offset

Both parties appeal from the damage offset award based on the value of CHTE’s release from its obligations under the NWM letters. The government argues that the trial court erred in imposing the burden of proving the value of the NWM release upon the government. The government challenges the court’s determination of the value of the NWM release, arguing that the court undervalued the release. CHTE, on the other hand, challenges the NMW release offset, arguing that the release had no monetary value because the enforcement proceedings would not have succeeded.

The government’s argument that CHTE bore the burden of proving the offset to the damage award is without merit. This court has previously held that “it [is] the government’s burden to prove with reasonable certainty the quantum of benefit retained by the [aggrieved party] despite the government’s breach.” WestFed Holdings, Inc. v. United States, 407 F.3d 1352, 1370 (Fed. Cir. 2005); see also Lisbon Contractors, Inc. v. United States, 828 F.2d 759, 769 (Fed. Cir. 1987) (“We do reject the government’s argument that [the plaintiff] had the burden to disprove the government’s claimed offset.

[5] On appeal, the government does not challenge the trial court’s finding that the enactment of FIRREA was a material breach of the government’s contract with CHTE. See CHTE, 65 Fed. Cl. at 298. Accordingly, having resolved the question of standing in CHTE’s favor, we proceed to consider the government’s arguments as to damages.

The burden was on the government to prove that amount."). Thus, the trial court did not err in concluding that the government bore the burden of proving the offset from CHTE's release from its NWM letters.

Citing testimony of government officials and SSA representatives, government documents, and enforcement proceedings, the trial court correctly found that there was uncertainty as to whether CHTE's NWM letters were enforceable. See CHTE, 65 Fed. Cl. at 318-20. Notwithstanding, Miller negotiated for their release in 1987 and 1988 at the direction of CHTE. The government contends, as it did before the trial court, that the parties agreed that the release of the NWM letters was an even exchange for CHTE's contribution of subdebt. Recognizing that when parties enter into a contract, each and every term and condition is in consideration of all the others unless otherwise stated, the trial court properly rejected the government's argument. See Stone Forest Indus., Inc. v. United States, 973 F.2d 1548, 1552 (Fed. Cir. 1992). As the trial court explained, and we agree, "[t]he 'exchange' of deal points, even if agreed to at the same time, does not necessarily establish the values exchanged are equal." CHTE, 65 Fed. Cl. at 321.

In determining the value of the release of CHTE's NMW letters, the trial court considered the testimony of the government's expert, Dr. Charles Cox, who testified that SSA's insolvency could have a maximum value of $204 million. The trial court, however, found the efficacy of these calculations of SSA's insolvency questionable because the NWM letters triggered CHTE's obligations based on SSA's net worth. Thus, the trial court determined that CHTE's maximum exposure had a value of $60,884,000, the value of SSA's regulatory capital deficiency as of March 31, 1988. Dr.

Cox also testified that shortly before the acquisition transactions closed, SSA had a $60.9 million regulatory capital deficiency. The trial court further found that there was a 15% likelihood of enforcement of the NWM letters, and the government does not challenge this finding. In sum, the court determined that monetary risk to CHTE under the NWM letters approached no more than 15% of its maximum exposure of $60,884,000, or $9,132,600. We find no clear error in the trial court's determination and accordingly uphold its determination of the value of CHTE's release from its NWM letters.

3. SSA's Equity

The government argues that the trial court erred in awarding CHTE its equity in SSA at the time of acquisition. Specifically, the government asserts that CHTE's stock ownership was not diluted and therefore nothing was contributed. The government's argument is correct in light of our recent holding in American Capital, Nos. 05-5150, -5152, -5159, slip op. at 7-10.

In American Capital, we held that a corporate parent of a subsidiary whose value was wiped out by FIRREA's elimination of the subsidiary's regulatory capital could not recover the value of the subsidiary's equity. Id. Although the parent, TFC, effectively "put on the table" its subsidiary Transohio's ongoing business, the transaction did not result in any formal change in Transohio's ownership. Id., slip op. at 7-8. Unlike the shareholders in Hansen Bancorp, Inc. v. United States, 367 F.3d 1297 (Fed. Cir. 2004), TFC was not contractually obligated to contribute or exchange its shares of Transohio in reliance on the government's promises; accordingly, it never acquired a "direct personal interest" in the effects of the breach on Transohio other than any shareholder's interest

in the value of the shares that it owns. Id., slip op. at 9-10. Although TFC was indirectly injured by the diminution in Transohio's value, the loss in value caused by the government's breach was first and foremost an injury to Transohio, and the fact that Transohio was a separate corporation prevented TFC from recovering that loss on Transohio's behalf. Id., slip op. at 8-9.

In the instant case, CHTE is situated similarly to TFC. Although CHTE effectively contributed SSA to a joint and risky venture with the government under the expectation that CHTE would indirectly reap the profits of the venture, American Capital compels a conclusion that any claim for the loss of SSA's equity must be asserted only by SSA.

Accordingly, the $2,279,700 that the trial court determined was the value of CHTE's equity in SSA, and thus included in CHTE's damages, cannot be recovered by CHTE and must be deducted from the award of damages. Its recovery of $14,847,100 must therefore be reduced to $12,567,400, or the value of its subdebt contribution ($21,700,000) less the discount for the release of obligations under the NWM letters ($9,132,600).

## CONCLUSION

For the foregoing reasons, the judgment of the Court of Federal Claims is affirmed in part and reversed in part, and the case is remanded with instructions to enter judgment in favor of CHTE in the amount of $12,567,400.

AFFIRMED-IN-PART, REVERSED-IN-PART, and REMANDED.

## COSTS

No costs.

# United States Court of Appeals for the Federal Circuit

05-5141, -5179

CAROLINE HUNT TRUST ESTATE,

Plaintiff-Cross Appellant,

v.

UNITED STATES,

Defendant-Appellant.

GAJARSA, Circuit Judge, dissenting.

In this, another case in the series of Winstar-related cases, the issue before the court is a simple one—whether a corporate holding company, which is a shareholder with no direct injury and no privity of contract, has standing to bring an action for damages incurred by one of its subsidiaries. In other words, does a shareholder in its legal capacity as a shareholder have standing to sue? For the reasons stated below, I dissent because the majority fails to recognize the corporate form and attendant corporate law limiting the liability and thereby the standing of shareholders.

CHTE was a savings and loan diversified holding company and as such was the principal shareholder of Southwest Savings Association ("SSA"), a FSLIC insured savings and loan. The majority premises its holding on the basis that "CHTE [the shareholder] was critical to the acquisition of the failing thrifts because it was a condition of FSLIC entering into the Assistance Agreement [not executed by CHTE] that the $25 million of subordinated debt of [SSA] be converted to equity capital." Slip op. at 11.

Moreover, it states that "[CHTE's] ownership interest in SSA could not have been diluted without [CHTE's] agreement" to be diluted, citing to the Court of Federal Claims ("CFC"). 65 Fed. Cl. at 288. The CFC found that CHTE provided material consideration for the acquisition, namely converting certain subordinated notes and the issuance of stock warrants. Slip op. at 12. However, this is faulty factual and legal analysis. A proper inquiry reveals that CHTE did not issue the warrants— they were issued by SSA and for SSA stock, not for any interest in CHTE. Furthermore, the contribution by CHTE of the SSA subordinated debt was exchanged at the request of CHTE and for the release of CHTE from a prior Net Worth Maintenance (NWM) obligation that was issued by CHTE. This subordinated debt of SSA was held by CHTE to obtain the government's approval for several non-assisted and unrelated prior acquisitions by CHTE in 1983 and 1986. All of these actions by CHTE were undertaken not as a principal party to the transaction at issue but as a stockholder in SSA, which was the acquiring corporate entity used to acquire the four failing thrifts. Contrary to the majority finding that there was a separate contract existing between the government and CHTE, there is <u>no</u> contract. There is no contract that creates a "mutual reciprocal obligation" between CHTE and the government. This is the reason why the majority and the CFC need to find the presence of an "overarching" agreement. By the mere use of the term, the majority is admitting that the contract is an epistemological illusion. CHTE did not sign any agreements and was not obligated to perform any contractual action or assume any debt in the transaction. Therefore, the finding of a contract is illusory.

The SSA and FSLIC entered into four Acquisition Agreements for each of the failed thrifts. Each of the agreements contained a "sole benefit" clause that stated the

agreements were for the benefit only of SSA and FSLIC. Moreover, SSA and FSLIC also signed an Assistance Agreement that identified SSA as the acquiring corporation and contained a similar sole benefit clause recognizing only SSA and FSLIC. Among other matters, the agreement contained the following relevant terms:

1. SSA performance was conditioned on the release of CHTE from its NWM commitments.
2. FSLIC conditioned performance on conversion of SSA's debt to stock and issuance of warrants by SSA.
3. FSLIC then provided financial assistance to the SSA in the form of $307.5 million in capital credit to remain on SSA's books for ten years without amortization.
4. An Integration clause stating that the writing constituted the entire agreement and the acquisition agreements and resolutions or letters by the parties, but that where there was any conflict the Assistance Agreement would govern.

Here the shareholder CHTE was provided an opportunity to limit its liability by eliminating the NWM obligation and expanding the capital of its subsidiary SSA. It essentially was the principal shareholder in SSA without any contractual obligations to contribute any further capital. Its percentage ownership in SSA was reduced by the acquisition but SSA was a vastly larger post-merger subsidiary. In its capacity as a shareholder, CHTE may only bring an action derivatively for a corporate injury, but typically, "shareholders do not have direct standing to bring the cause of action" for damages incurred by the corporation. Franchise Tax Bd. v. Alcan Aluminium, 493 U.S. 331, 336 (1990). The cause of action, if any, belongs to the corporation.[1]

The government correctly argues that CHTE is a classic shareholder with no standing to assert a breach of contract because the contract was between its subsidiary

[1] Hypothetically, if SSA were bankrupt, the cause of action belongs to the bankruptcy estate, and the recovery by the trustee would be for the benefit of all creditors and residually to all the shareholders.

SSA and the United States. CHTE contends that it has standing because even though it is not a signatory on the Assistance Agreement or any other document, it was a party to the "overarching" or "overall" contract created by its prior application to merge a subsidiary and the FHLBB's resolutions.

The problem we as a court are confronting is the conflicting precedential cases from this court that seem on first blush, to support the respective position of each party regarding standing.[2] The government argues that Southern California Federal Savings & Loan Assoc. v. United States, 422 F.3d 1319 (Fed. Cir. 2005) ("SoCal") is applicable. [3] There we held the CFC's grant of standing in a similar contract to be error and reversed. CHTE cites our decision in Home Savings of America v. United States, 399 F.3d 1341 (Fed. Cir. 2005). There we upheld the CFC's grant of standing.

In SoCal, Individual Plaintiffs proposed to the government their plan to form and personally capitalize a holding company, known as SoCal Holdings ("SCH"), which would purchase a failing thrift, Old Southern, and form a new savings and loan association. 422 F.3d at 1325. Upon government approval, the new savings and loan, named Southern California Savings & Loan ("SoCal"), would acquire the assets and liabilities of Old Southern. Id.

The government approved the acquisition and entered into a series of agreements. Among these was the Assistance Agreement, which was entered into by

---

[2] It should be noted that the CFC did not reconcile the conflicting cases nor discuss why it relied on one and not the other.

[3] See also Cain v. United States, 350 F.3d 1309 (Fed. Cir. 2003); FDIC v. United States, 342 F.3d 1313 (Fed. Cir. 2003); Bailey v. United States, 341 F.3d 1342 (Fed. Cir. 2003); Maker v. United States, 314 F.3d 600 (Fed. Cir. 2002); and Glass v. United States, 258 F.3d 1349 (Fed. Cir. 2001), all of which have concluded that shareholders have no standing to sue.

SCH. It contained a "Sole Benefit" provision describing the parties to the agreement as the sole beneficiaries entitled to rights. Id. at 1329. Moreover, the agreement had an "Entire Agreement" clause identifying the Assistance Agreement as the sole agreement excepting only resolutions or letters concerning the conversions. Id. After FIRREA, SoCal had some financial difficulties, and was forced to dispose of assets and raise additional capital from its investors. Id. at 1326. The effect was to dilute the ownership of the Individual Plaintiffs in SCH. Gradually, SoCal improved after the infusion of new capital. Id. at 1327.

The Individual Plaintiffs sued the United States in the CFC. The CFC held that the Individual Plaintiffs were in privity of contract and therefore had standing to sue. Id. Similar to our case now, the CFC in SoCal determined that the Individual Plaintiffs were parties to an "overall" contract with the government because they had negotiated with the government before the creation of SCH and the government knew the Individual Plaintiffs would be supplying the money used to rehabilitate SoCal. Id. at 1331. Furthermore, the court found that the Assistance Agreement was part of the overall contract and that its sole benefit provision was unenforceable because the Entire Agreement Clause would have allowed inclusion of the Regulatory Capital Maintenance Agreement ("RCMA") to which the Individual Plaintiffs were a party. Id. at 1329.

In SoCal, we reversed the CFC. First, we rejected the court's interpretation of the Entire Agreement clause to read out the Sole Benefit clause. Id. at 1329-30. We noted that the Entire Agreement clause only included resolutions or letters and not the RCMA. Id. at 1330. Further, we interpreted the RCMA to be a completely separate contract with its own Entire Agreement clause. Id. Next, we rejected the importance

the CFC gave to the Individual Plaintiffs' participation in the negotiation and contracting process because there was no unity of interest with SCH and SoCal that would work an injustice if the corporate form were observed. Our conclusion was based on the recognition of the corporate form the Individual Plaintiffs established. Id. at 1331-32. We did, however, note that the Individual Plaintiffs were in privity with the government on the RCMA but could not recover the damages sought under the RCMA. Id. at 1334.

In Home Savings, Home Savings ("Home"), a wholly-owned subsidiary of H.F. Ahmanson & Co. ("Ahmanson"), acquired 17 thrifts in four transactions at issue in the appeal. 399 F.3d at 1344-45. Each transaction was memorialized in an assistance agreement. Id. at 1345. The "Florida/Missouri" and "Illinois/Texas" Assistance Agreements contained integration clauses that included FHLBB resolutions and letters issued with the agreements. The "Century" and "Ohio" agreements also integrated certain resolutions addressed to the transactions. Id. In each transaction, "Ahmanson sought federal assistance to mitigate the liabilities its subsidiary, Home, was assuming." Id. In resolutions and forbearances for each transaction, FHLBB agreed that Home could count supervisory goodwill toward reserve capital and that it would not take action against Home for failing to meet reserve capital. Id.

Even though Ahmanson was not a signatory of the assistance agreements and the agreements contained sole benefit clauses, this court affirmed the CFC's conclusion that Ahmanson was in privity with the government. Id. at 1348-50. In Home Savings, we approved the CFC's determination that Ahmanson was a party to a much larger "overall" transaction because the resolutions contained reciprocal promises between the government and Ahmanson. Namely, Ahmanson promised it would maintain Home's

net worth, and the government promised it would provide financial assistance in the form of special accounting treatment. Id. at 1349. Furthermore, the court approved the CFC's recognition that Ahmanson was the offeror that initiated negotiations that eventually led to the agreement. Id. at 1349-50.

It is difficult to reconcile these conflicting cases. In Home Savings, we considered the shareholder's participation in the negotiation very important, whereas in SoCal, the participation did not overcome the fact that the subsidiary was the actual party to the contract. Furthermore, in Home Savings, we recognized that the negotiations, offers, agreements, and resolutions made an overall contract, whereas SoCal did not recognize the existence of an overall contract.

The key feature in both cases is the sole benefit and entire agreement clauses. In Home Savings, the sole benefit clause was virtually ignored because the integration clause included resolutions that contained reciprocal promises between the shareholder and the government. In SoCal, however, the court gave significant weight to the clauses because the Entire Agreement clause had not integrated the RCMA, which was the only document signifying an agreement with the shareholders.

In the present case, the Entire Agreement clause ("EA clause") and the Sole Benefit clause ("SB clause") serve to prevent CHTE from benefiting under the contract. The SB Clause states that the Assistance Agreement, which includes a condition for release of CHTE, is for the Sole Benefit of the parties and not CHTE. Thus, to this extent, the Assistance Agreement is the entire agreement and where there is a conflict, it is the controlling document. Therefore, the only parties to the enforceable agreement are the FHLBB and SSA, not CHTE. Any other documents that CHTE relies on to be

considered a contracting party are precluded by the EA and SB clauses. It is not in privity with any of the agreements.

As in SoCal, CHTE may have negotiated the contracts as the CFC found, but they did not structure their commitments in any way that makes them liable. Instead, all the legal obligations are issued by the subsidiary making the subsidiary liable. CHTE places great weight on the resolutions, releases, and forbearances suggesting that CHTE was a party and negotiated a release of its NWM commitments in exchange for the subordinated debt. These facts, however, support the proposition that CHTE was acting solely as the shareholder parent and not as a party in privity of contract. By releasing itself from the liability of maintaining SSA's net worth, it distanced itself from SSA's failure and agreement to acquire insolvent institutions. Unlike Home Savings there are no "mutual, reciprocal obligations" where the shareholder further increased its liability for maintenance of the net worth; here, CHTE had no such liability as a shareholder of SSA.

Moreover, CHTE places great weight on the H-(e)3 application and its implications as an overall contract. But, there is no indication that the application is separate from the Assistance Agreement that included a sole benefit clause and removes any conflict among the parties. Moreover, the resolution authorizes and approves the execution by FHLBB of the agreements. The release obtained by CHTE was for its benefit, and as a shareholder, it negotiated that release as a condition of SSA's participation in the Assistance Agreement. CHTE thereby had no financial or legal obligation under any agreement, and it was not a signatory to any agreement that would provide the required Article III standing.

At most, we could consider the government's release of CHTE from the NWM commitments as a contract between the government and CHTE. Though the Release references the Assistance Agreement, it does so only to note that it is a condition of SSA's performance. The Release itself states that the government releases CHTE from the commitments in return for the conversion of $25 million in subordinated debt to equity in SSA. CHTE was not exposed to any liability as a shareholder under the SSA contracts. There is no indication that CHTE retained any benefits from the contract/condition and no evidence that the government intended it. The only party in interest here is SSA and not the shareholder CHTE. Similarly, in Domino's Pizza Inc. v. McDonald, 126 S.Ct. 1246 (2006) where a contract right was created between the company and the franchisee, the shareholder had no contract rights. Specifically, the Court held that:

> [I]t is fundamental corporation and agency law—indeed, it can be said to be the whole purpose of corporation and agency law—that the shareholder and contracting officer of a corporation has no rights and is exposed to no liability under the corporation's contracts.

Id. at 1250-51.

Here we have the classic case where there is only a mist of evidence that the majority endeavors to make into a cloud of evidence. But as we have stated previously "there needs to be something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable rights." D&N Bank v. United States, 331 F.3d 1374, 1377 (Fed. Cir. 2003).

This action fails to meet Article III standing requirements. However, the majority has allowed a shareholder to recover on a cause of action premised upon "privity" of an "overarching" contract between a shareholder and the government. We once again find

privity of contract where no contractual obligation or consideration on the part of the shareholder exists.[4] There is no "overarching" agreement which is enforceable by the shareholder. The "overarching" is as illusory as a rainbow, and in this particular case the shareholder has indeed found a pot of gold at the end.

To allow CHTE standing not only violates Article III but also the corporate form, as well as the intent of the parties in negotiating the Entire Agreement-type clauses. Thus, CHTE has no standing, and the CFC judgment should be reversed. The majority continues to deny the existence of a legal differentiation between a corporation and its shareholder. Here, the shareholder's use of a corporate structure to limit its liability should be respected. We should not, however, permit what in essence is a reverse corporate veil piercing by the shareholder allowing it to recover damages under an "overarching" agreement. The majority grants standing to a non-contracting party. Moreover, we fail to enforce classic corporate contract clauses that are negotiated and accepted by the contractual parties. For these reasons, I dissent.[5]

---

[4] The majority states that the government does not challenge the trial court's finding that the enactment of FIRREA was not a material breach of the government's contract with CHTE; however, the government challenges the existence of the contract with CHTE. The majority cannot grant CHTE standing without the existence of the illusory "overarching" contract.

[5] The majority does not allow the recovery of CHTE's equity. I agree; however, I dissent to the basic principle that standing is allowed premised on an "overarching" agreement.

CERTIFICATE OF FILING

I hereby certify that on December 15, 2006, a copy of the foregoing "MOTION FOR LEAVE TO CITE SUPPLEMENTAL AUTHORITY IN SUPPORT OF THE GOVERNMENT'S CROSS-MOTION FOR SUMMARY JUDGMENT AND TO ISSUE A DECISION ON THE PENDING CROSS MOTIONS, OR, IN THE ALTERNATIVE, TRANSFER THE CASE FOR DECISION BY ANOTHER JUDGE" was filed electronically. I understand that notice of this filing will be sent to all parties by operation of the Court's electronic filing system. Parties may access this filing through the Court's system.

s/David A. Levitt