# In the United States Court of Federal Claims

No. 95-250C
Filed: May 11, 2007
FOR PUBLICATION

* * * * * * * * * * * * * * * * * * * * * * * * *

1ST HOME LIQUIDATING TRUST, et al.,

*Plaintiffs,*

v.

THE UNITED STATES,

*Defendant.*

* * * * * * * * * * * * * * * * * * * * * * * * *

Summary Judgment; *Winstar* line of cases; Voluntary Supervisory Conversion; *D & N Bank v. United States,* 331 F.3d. 1374 (Fed. Cir. 2003); *1st Commerce v. United States,* 335 F.3d 1373 (Fed. Cir. 2003); *Anderson v. United States*, 344 F.3d 1343 (Fed. Cir. 2003); "Ordinary Principles of Contract;" Money-Back Restitution; Material Breach

*Jerry Stouck*, Greenberg Traurig, Washington, D.C., Washington, D.C. and *Catherine R. Bauner*, of counsel, for Plaintiffs.

*David A. Levitt*, Trial Attorney, with whom were *Stuart E. Schiffer*, Deputy Assistant Attorney General, *David M. Cohen*, Director, and *Jeanne E. Davidson*, Deputy Director, Department of Justice, Civil Division, Commercial Litigation Branch, Washington, D.C. for Defendant.

## OPINION and ORDER

**SMITH**, Senior Judge.

This case arises out of the *Winstar* line of cases, the background of which is well described in *Winstar Corp. v. United States*, 518 U.S. 839 (1996), and the cases leading to it. The facts of this case differ slightly from most of the other *Winstar*-related cases. In most of the other cases, healthy thrifts were encouraged to acquire financially troubled thrifts. *See, e.g.*, *Winstar Corp.*, 518 U.S. at 847. However, in this case outside investors were used instead of a healthy thrift. A $32.5 million investment facilitated the voluntary supervisory conversion[1] and allowed a group of

[1] "A voluntary supervisory conversion is where a single entity acquires all of the stock of a thrift in exchange for contributing enough capital to satisfy regulatory net worth requirements without first receiving account holder approval or offering shares on the market." *Southtrust of Georgia, Inc. v. United States*, 54 Fed. Cl. 741, 742 n.1 (2002).

investors to acquire and recapitalize 1st Home.

The present case is now before the Court on 1st Home Liquidating Trust's ("1st Home") Motion for Summary Judgment on Liability and Money-Back Restitution for Breach of Contract,[2] and the Government's Cross-Motion for Summary Judgment and Motion to Dismiss for Failure to State a Claim upon which Relief can be Granted. At issue is whether the parties entered into a contract to allow 1st Home to convert from a mutual-based to a stock-based savings and loan association. In particular, 1st Home contends that the defendant contracted with it to allow use of the purchase method accounting under generally accepted accounting principles ("GAAP") and could include resulting goodwill, amortized over thirty (30) years, as capital for the purpose of meeting its regulatory capital requirements. For the reasons set forth below, the Court **GRANTS** 1st Home's Motion for Summary Judgment and **DENIES** the Government's Cross-Motion and Motion to Dismiss.

## PROCEDURAL BACKGROUND

1st Home filed a complaint for monetary relief for breach of contract and other damages flowing from the government's alleged failure to perform in connection the transaction in this case. Thereafter, this Court issued an Order denying the motions of plaintiffs to strike defendant's statement of genuine issues and defense of prior material breach, and defendant's motion to strike plaintiffs' statement of genuine issues. Additionally, the court granted plaintiffs' motion for leave to file a surreply and motion for leave to file notice of recent decisions, as did the court grant the defendant's motion for leave to file a surreply. The parties were finally ordered to restart and conclude briefing on plaintiff's contractual claims in light of recent case law. *See Anderson v. United States*, 344 F.3d 1343 (Fed. Cir. 2003); *First Commerce Corp. v. United States*, 335 F.3d 1373 (Fed. Cir. 2003); *D & N Bank v. United States*, 331 F.3d 1374 (Fed. Cir. 2003).

Subsequently, cross-motions for summary judgment were filed and briefed by both parties and defendant further filed a motion to dismiss for failure to state a claim upon which relief can be granted. Each party opposed and responded to the other's motion for summary judgment. The plaintiff and defendant, respectively, filed proposed findings of uncontroverted fact, to with each party promptly responded. The plaintiff next filed citations to supplemental authority highlighting the effects of recent decisions relating to the *Winstar* litigation to which the defendant responded. Defendant has filed, and plaintiff responded to, a motion for leave to file supplemental authority in support of their other motions and to issue a decision on the pending cross-motions. The Court has considered these motions and filings in finding the following.

---

[2] This Opinion will only address 1st Home's claims for breach of contract that are presented herein. This opinion does not address 1st Home's claims including, Fifth Amendment taking and due process claims, which have been stayed pending resolution of the contract issues.

## BACKGROUND

### I. Regulatory Framework Governing Conversions

This case arises out of the statutory requirement that 1st Home obtain approval to convert from a federally-chartered mutual savings and loan to a federally-chartered stock savings and loan. Therefore, it is helpful to discuss briefly the regulatory framework governing conversions before delving into the specific facts of this case.

Prior to the enactment of the Financial Institutions Reform Recovery and Enforcement Act of 1989 ("FIRREA"), Federal regulation of the thrift industry was the primary responsibility of the Federal Home Loan Bank Board ("FHLBB"). *See generally* 12 U.S.C. § 1464 (2006). The Federal Savings and Loan Insurance Corporation ("FSLIC"), an arm of the FHLBB, administered a fund that insured deposits held by thrift institutions. 12 U.S.C. § 1726 (1982) (repealed 1989). The insurance fund was supported by insurance premiums assessed upon the thrift industry. 12 U.S.C. §§ 1725-29 (1982) (repealed 1989). In order to limit the risk posed by institutions to this insurance fund, and to protect stability, the thrift industry was heavily regulated. *See Winstar Corp. v. United States*, 64 F.3d 1531, 1535 (Fed. Cir. 1995) (*Winstar II*) (recounting history of FIRREA and the thrift industry). The Board promulgated net worth regulations that required thrifts to maintain specified levels of net worth. *See e.g.* 12 C.F.R. § 563.13(b)(2)(1982), 12 C.F.R. § 563.13(b)(2)(1983). For purposes of determining compliance with net worth requirements and other financial regulations, the Board generally required thrifts to adhere to the Generally Accepted Accounting Principles ("GAAP") unless otherwise specified. *See* 12 C.F.R. § 562.23-3(c)(1982).

Historically, most thrifts had been organized as mutual associations which were owned by their depositors. Mutual associations had the option of converting from mutual form to the more familiar stock corporation form, in which ownership resides not in the depositors, but in its shareholders. No insured thrift institution could convert from mutual to stock form without complying with the applicable rules and regulations of the Board and the FSLIC. 12 U.S.C. § 1464(i) (2006); 12 U.S.C. 1725 (j)(1982) (repealed 1989); 12 C.F.R. § 563b.1 (1986) ("[N]o mutual insured institution shall convert to the capital stock form without the written consent of the Board."). Stock institutions had the advantage that they could raise capital through the sale of stock. This caused many to convert during the period of this case since capital shortages were a critical problem.

### II. Conversion of 1st Home

1st Home Federal Savings and Loan Association of the Carolinas was one of the largest thrifts in North Carolina in the early 1980s. Like many savings and loans, however, 1st Home was affected adversely by the "thrift crisis" of the early 1980s. Melvin Aff. Para. 8. By the end of 1984, 1st Home had regulatory capital (or net worth) of $31.5 million, as calculated under one set of

accounting rules, the regulatory accounting principles ("RAP").[3] *See* Ex. 5 at 31. Calculated under GAAP, another set of accounting rules, 1st Home had a net worth of a negative $36.7 million.[4] To avoid insolvency, 1st Home discussed converting from a federally-chartered mutual savings and loan to a federally-chartered stock savings and loan.

On July 23, 1985, in compliance with the governing regulations, 1st Home submitted an Application for Voluntary Supervisory Conversion ("the Application")[5] to the FHLBB for regulatory approval. As part of the Application, the investors proposed to purchase all of the newly converted stock, worth about $30 million. The capital infusion was designed to provide the bank with enough capital to remain solvent.

Additionally, the Application requested certain regulatory forbearances, without which the bank would have become immediately insolvent. 1st Home sought to obtain a promise from the FHLBB not to enforce certain minimum regulatory net worth requirements to provide a regulatory cushion to allow the bank to get back on it's feet in the first few years after the conversion. Specially, the bank requested that:

> FSLIC shall forbear from taking any action...for a period of five years from the effective date of the Conversion in the event that the failure to meet minimum regulatory net worth requirement would not have occurred were the association permitted to report its net worth in accordance with current regulatory principles.

Ex. 5 at 32. The Application further included a Resolution of the 1st Home Board of Directors stating that the conversion was premised on being able to use purchase method accounting for regulatory capital reporting purposes following the conversion. Submitted with the Application was a Business Plan to Rehabilitate ("Business Plan") a three-year business plan to be implemented to make the bank profitable. The Business Plan relied heavily on recognizing supervisory goodwill through purchase accounting principles under GAAP. Using this purchase method accounting under GAAP, 1st Home would record an entry on the thrift's book entitled "goodwill," an intangible asset valued as the excess of liabilities over assets at the time of conversion. Recognizing the 'goodwill'

---

[3] The FHLBB at that time permitted thrifts to report regulatory capital compliance on the basis of RAP, which was more favorable to the appearance of capital sufficiency than GAAP. *See* Melvin Aff. Para 10; *Winstar*, 518 U.S. at 845-46.

[4] The approximately $60 million difference between 1st Home's positive regulatory capital on a RAP basis, and its negative capital on a GAAP basis, was due primarily to losses on loan sales that could be deferred and amortized under RAP, but had to be recogniezed immediately under GAAP. Melvin Aff. Para 11 & Ex. 4 at 250-009.

[5] "A voluntary supervisory conversion is where a single entity acquires all of the stock of a thrift in exchange for contributing enough capital to satisfy regulatory net worth requirements without first receiving account holder approval or offering shares on the market." *Southtrust of Georgia, Inc. v. United States*, 54 Fed. Cl. 741, 742 n.1 (2002).

as such would offset 1st Home's negative net worth and bring the thrift into regulatory capital compliance after the infusion of $30 million by the investors.[6]

On December 26, 1985, the FHLBB adopted Resolution No. 85-1214 ("the Resolution"), approving the conversion. The approval of the conversion was conditioned on 1st Home submitting a letter from its independent accountants ("accountants letters") that "specifically describe[d] . . . any intangible assets, including goodwill" that arose through the use of GAAP. Ex. 11 at 437. The next day, the FHLBB issued a forbearance letter ("forbearance letter") that granted only a three-year forbearance, not the five years that was requested.[7]

1st Home's independent accountants then provided the FHLBB with the information requested by the Resolution. In a subsequent letter dated May 8, 1987, the accountants reported that as of October 31, 1986 (the effective date of the conversion), 1st Home recorded goodwill in the amount of $26.546 million to be amortized over 30 years, and stated that "the accounting treatment . . . [is] in conformity with [GAAP]." Ex. 21 at 517.

## DISCUSSION

### I. Standard of Review

Summary judgment is appropriate when there are no genuine disputes over material facts and the moving party is entitled to prevail as a matter of law. RCFC 56(c). *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247 (1986). Material facts are those "facts that might affect the outcome" of the litigation. *Id. at* 248. A genuine dispute concerning a material fact exists when the evidence presented would permit "a reasonable jury [to] return a verdict for the non-moving party."*Id.* Thus, in order to prevail upon a motion for summary judgment, a party must demonstrate that no disputed facts exist which would change the outcome of the litigation. Any doubt over a factual issue must

---

[6] "Estimated goodwill of $47.6 million will result from the proposed transaction and will be composed of two parts. Approximately $36.9 million is the result of negative GAAP net worth and will be amortized over 30 years. The remaining $10.7 million represents the discounts on mortgage loans and mortgage-backed securities and will be amortized over the estimated remaining life of these assets." The Application, Ex. 5 at 242.

[7] The forbearance issued by the FHLBB stated that "[f]or a period of three years following the effective date of the voluntary supervisory conversion . . . [the FSLIC], shall forbear from taking action pursuant to Section 563.13(d) of the Rules and Regulations for the Corporation in the event that 1st Home fails to meet its minimum regulatory net worth requirement, provided such deficiency would not have occurred were 1st Home permitted to calculate its net worth in accordance with regulatory accounting principles in effect at such time." Ex.13 at 440.

be resolved in favor of the non-moving party, to whom the benefit of presumptions and inferences runs. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citing *United States v. Diebold, Inc.* 369 U.S. 654, 655 (1962)). The existence of a contract is a mixed inquiry of law and fact. *LaVan v. United States*, 382 F.3d 1340 (Fed. Cir 2004) (citing *Cienega Gardens v. United States*, 194 F.3d 1231 (Fed. Cir 1998).

## II. The Contract

The crucial question in this case, as in all *Winstar* cases, is whether the FHLBB entered into a contract with the thrift or, on the other hand, if it was merely exercising its regulatory authority. In this case, 1st Home asserts that it contracted with the FHLBB for the use of purchase method accounting principles to recognize the supervisory goodwill and that the supervisory goodwill to be amortized over a specific period following its supervised conversion from mutual fund to capital stock association. Further, 1st Home alleges that it also contracted with FHLBB to forbear from enforcing certain regulatory requirements for a period of three years after the conversion.

While in this case neither party points to an explicit contract document, case law has held that regulatory transactions and contemporaneous documents may constitute a contract. *Fifth Third Bank of W. Ohio v. United States*, 402 F.3d 1221, 1234 (Fed. Cir. 2005) ("Since standardized agency documents are the way in which regulatory agencies typically memorialize their actions, the FHLBB can memorialize a contractual commitment in agency documents."); *Anderson*, 344 F.3d at 1354 (citations omitted) ("If the factual records of individual cases show intent to contract with the government for specified treatment of goodwill, and documents such as correspondence, memoranda and FHLBB resolutions confirm that intent, the absence of an assistance agreement or supervisory action agreement . . . [is] irrelevant to the finding that a contract existed."). *See also California Federal Bank, FSB v. United States*, 39 Fed. Cl. 753, 773 (1997), *aff'd*, 245 F.3d 1342 (Fed. Cir. 2001) ("*CalFed*") ("Mutuality of intent, even in the context of written contracts, may be established by several contractual instruments as opposed to one superseding document.").

When dealing with *Winstar* cases, the Court applies "ordinary principles of contract" to determine whether the government entered into a contract with the private party. *Winstar*, 518 U.S. at 871. When the government is a party, there are four elements required to form a contract: "(1) mutuality of intent to contract; (2) lack of ambiguity in offer and acceptance; (3) consideration; and (4) a government representative having actual authority to bind the United States in contract." *Anderson*, 344 F.3d at 1353; *Fifth Third*, 402 F.3d at 1228 (stating that contract formation requires offer and acceptance, consideration, actual authority, and mutuality of intent); *Northeast Savings v. United States*, 63 Fed. Cl. 507, 514-15 (2005). The Court will, therefore, turn its attention to these four elements.

### A. Mutuality of Intent to Contract

In the instant case, 1st Home contends it made an offer and the government accepted it. The

offer was to convert from a mutual fund to a capital stock association, with a capital infusion, in exchange for the right to use purchase method accounting, amortize supervisory goodwill over a specified period of time, and for regulatory forbearances. The government contends that 1st Home merely submitted an application premised on a certain type of accounting treatment and that approval of the application under the FHLBB's regulatory authority does not constitute evidence that the applicant and the FHLBB intended to form a contract.

While "it would be improper to presume the existence or non-existence of a contract," the Supreme Court and the Federal Circuit have generally viewed the dealings between the FHLBB and the acquiring institutions in *Winstar* cases as a whole as often having "contractual dimensions." *Fifth Third*, 402 F.3d at 1231. Further, it is clear, that there can be no contract unless both parties have the voluntary, mutual intent to contract. *Anderson*, 344 F.3d at 1353 (citing RESTATEMENT (SECOND) OF CONTRACTS § 18 (1981)) ("Manifestation of mutual assent to an exchange requires that each party either make a promise or begin to render performance."). To prove mutuality of intent, a Plaintiff must, by objective evidence, show that one party to the contract extended an offer and then that the other party accepted that offer. *Anderson*, 344 F.3d at 1353. Three *Winstar* cases, *D & N Bank v. United States*, *1st Commerce v. United States*, and *Anderson v. United States*, have expanded upon the proof required to find mutuality of intent in the *Winstar* context. *D & N Bank v. United States*, 331 F.3d 1374 (Fed. Cir. 2003), *1st Commerce v. United States*, 335 F.3d 1373 (Fed. Cir. 2003), *Anderson v. United States*, 344 F.3d 1343 (Fed. Cir. 2003). The Court will, therefore, take each case in turn.

First, in *D & N Bank*, the Federal Circuit held that to prove mutuality of intent, there needs to be "something more than a cloud of evidence that could be consistent with a contract to prove a contract and enforceable contract rights." 331 F.3d at 1378. The court explained that 'something more' required a "clear indication of intent to contract and the other requirements for concluding that a contract was formed." *Id.* Thereafter, in *1st Commerce*, the Federal Circuit applied the common law doctrine of the "mirror image rule." The Court held that there was a mismatch between the offer (the application) and the acceptance because the Bank Board forbearance letter was not a "mirror image" of the offer. Thus, the case was remanded with instructions to review the possibility of a counteroffer. *Id. at* 1381. Lastly, *Anderson* involved a situation where the thrift and the Bank Board did not specifically negotiate for special goodwill treatment. 344 F.3d at 1358. *Anderson* emphasized the need for the offer to clearly show intent of the parties to enter into a bargain that is definite enough for another party to understand that an offer is not only an invitation to enter into a binding contract but also that the acceptance of this invitation will conclude the transaction. *Id.* at 1353. Under the standard articulated in *First Commerce* and *Anderson*, an offer is 'something more' then a mere cloud of contractual language when one party has manifested a willingness to enter into a bargain and this willingness is communicated to the other party. In the context of *Winstar* cases, an offer by the thrift is usually encapsulated in the application and its requested supervisory forbearances, waivers, findings, and determinations. *Anderson*, 344 F.3d at 1353. The thrift in *Anderson* specifically negotiated for straight line amortization of the goodwill and conditioned their offer on it. *Id.* at 1354. However, the court found that the Bank Board failed to accept that offer by failing to manifest their agreement with the terms of the offer. *Id.* Namely, the Bank Board resolution issued was silent regarding the amortization of the goodwill, the critical

component of the application. *Id.* at 1355. This silence failed to show a manifestation of agreement to the same bargain proposed by the offer, the "something more" that *D & N Bank* requires. *Id.* at 1357. However, in *First Commerce*, the court simply held that the formal application was "definite enough to constitute an offer" because it encapsulated terms that the thrift and the Bank Board had already negotiated. *First Commerce*, 335 F.3d at 1381. The Court must, therefore, turn to the facts at hand.

**1. The Offer**

In the instant case, 1st Home contends it made an offer to the government to convert from a mutual fund to a capital stock association in exchange for the right to use purchase method accounting, amortize supervisory goodwill over a specified period of time, and regulatory forbearances, without which, the proposed conversion would not have been possible. In March 1985, to avoid insolvency, 1st Home's counsel began negotiating with the FHLBB to allow 1st Home to convert from mutual to stock savings and loan. Between March and May of that year, 1st Home and the FHLBB negotiated the terms. As part of the conversion, the FHLBB advised 1st Home that regulatory policy required immediate change from RAP to GAAP for purposes of calculating net worth requirements following a supervisory conversion. Exhibit 2 at 8-9; Ex. 8 at 420-21. Understanding that sudden conversion from RAP to GAAP would have a devastating effect on 1st Home's ability to meet its regulatory capital requirements, 1st Home offered to gradually phase out RAP accounting over five years, Ex. 2 at 9, after the $30 million cash infusion.[8] Ex. 2 at 14. Thus, in June of 1985, 1st Home responded that it intended to seek a five-year forbearance from the FHLBB in order to avoid any penalty for falling out of compliance with regulatory capital requirements as a result of the change from RAP to GAAP. Ex. 3 at 17.

In July 1985, 1st Home submitted an Application for Conversion and the accompanying Business Plan, which indeed contained the five-year forbearance request. Ex. 5 at 31-32 (requesting "the FSLIC forebear from taking any action . . . for a period of five years from the date of the conversion in the event that the failure to meet with minimum regulatory net worth requirements would not have occurred had the Association been permitted to report its net worth with [RAP]."). The Application requested FHLBB's approval of the Application's terms, including the written promise of forbearance in the case of 1st Home's failure to meet regulatory capital requirements, Ex. 5 at 31-32, that 1st Home be allowed to use purchase method accounting in the conversion, Ex. 3 at 126-27, and that 1st Home's negative net worth be offset with goodwill, treated as an asset and amortized over an extended period. Ex. 5 at 192, 240-44.

Plaintiffs contend that the letters to the FHLBB and the Application and Business Plan are objective evidence of the offer made by 1st Home to the FHLBB. The documents, taken as a whole, demonstrate 1st Home's offer to enter into an agreement for supervisory conversion by securing $30

---

[8] As the *Winstar* court observed, "no healthy thrift would consummate a transaction that [would] immediately put it in regulatory noncompliance." *Winstar II*, 64 F.3d at 1542.

million in new outside investment in exchange for promises from the FHLBB; specifically, that it would temporarily forbear from enforcing regulatory net worth requirements, allowing1st Home to use purchase method accounting and treat goodwill as an asset to be amortizated over an extended period.

Plaintiffs argue that 1st Home's Application and Business plan were an offer to the FHLBB and are distinguishable from the transaction in *D & N* and resembles the situation in *First Commerce*. In *D & N*, the court reiterated that regulatory approval did not amount to the intent to contract because it was the Bank Board's regulatory function to approve mergers and an agency cannot create contractual liability simply by performing its regulatory functions. *Id. at* 1378-79. Notably in this case, none of the documents offered by the thrift mentioned goodwill or its accounting treatment. *Fifth Third*, 402 F.3d at 1230 ("D & N provided no evidence demonstrating the parties intent to contract . . .[n]otably, none of the documents proffered by D & N mentioned goodwill or the accounting treatment thereof."). Unlike in *D & N*, 1st Home's Application made numerous reference to the requested regulatory forbearances and the proposed treatment of the supervisory goodwill, terms that were the product of negotiations. As the *D & N* court found, reference to these provisions evidences a contractual relationship, rather than that of mere regulatory approval. Additionally, the FHLBB's acquiescence to these terms (regarding the accounting treatment of goodwill) was a departure from the regulatory criteria in place. The FHLBB's acceptance terms of 1st Home's Application demonstrates a departure from existing regulatory scheme and shows a give and take between the parties. The factual record of this case indicates an intent to contract with the government for specific treatment, and the conversations, correspondence, and documents confirm this intent. The Court, therefore, finds that there is sufficient evidence to demonstrate a contractual offer. *See Anderson*, 344 F.3d at 1354; *First Commerce*, 335 F.3d at 1381 (finding that First Commerce's formal conversion application, considering the relationship between the parties and totality of circumstances, was definite and complete enough to constitute an offer).

**2. The Acceptance**

The Court, having found that 1st Home made an offer to FHLBB, must now determine whether the FHLBB accepted the offer. The Court finds that 1st Home's formal application, correspondence, and communications with FHLBB, while sufficient to constitute an offer, was not accepted by the FHLBB's resolution and forbearance letter, due to the discrepancy between 1st Home's request for a five-year forbearance and the FHLBB's grant of a three-year forbearance.

"For a contract to be formed once an offer is made, there must be an acceptance, i.e. a 'manifestation of assent' to the terms thereof made by the offeree in a manner invited or required by the terms of the offer." *Anderson*, 344 F.3d at 1355 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 50 (1)). Something more than mere regulatory approval is necessary to support a finding that the Government accepted an offer and entered into a contractually binding agreement. *D&N Bank*, 331 F.3d at 1379. *Anderson* elaborated on the "something more" requirement and explained that a manifestation of assent to the same bargain proposed by the offer must be shown. *Anderson,* 344 F.3d at 1356 (quoting RESTATEMENT (SECOND) OF CONTRACTS § 50 cmt. a).

In *First Commerce*, the court also considered whether the FHLBB had accepted an offer by the thrift. The court applied the "mirror image" rule, under which the acceptance must perfectly mirror the terms of the offer. *First Commerce*, 335 F.3d at 1381 (quoting *Iselin v. United States*, 271 U.S. 136, 139 (1926) ("[I]t is well settled that . . . an acceptance upon terms varying from those offered, is a rejection of the offer, and puts an end to the negotiation, unless the party who made the original offer renews it, or assents to the modification suggested."). The court, in *First Commerce*, held that a mismatch of the treatment of depreciation between an Application and later FHLBB Resolution and forbearance letter negated the formation of a contract because the alleged offer and acceptance were not 'mirror images' of each other. *First Commerce*, 335 F.3d at 1381.

In the present case, 1st Home's offer of a five-year forbearance was clearly rejected when the FHLBB proposed a three-year forbearance instead. Accordingly, no binding contract could be formed by the exchange of 1st Home's formal Application and the FHLBB's Resolution and Forbearance because the offer and acceptance did not mirror each other as required by the mirror image rule. The court, therefore, holds that the FHLBB did not accept 1st Home's offer as memorialized in the Application and Business Plan.

### 3. The Counter-offer and Acceptance

Absent a definite acceptance by the FHLBB, 1st Home argues that the FHLBB documents manifest as a counter-offer, to which 1st Home accepted by its conduct of engaging in the conversion and otherwise relying on the FHLBB's representations. The government argues that because there is no reference in the forbearance letter to goodwill, the forbearance letter cannot be viewed as a counter-offer.

The same "common law rules that disqualify the FHLBB's forbearance letter as an acceptance" may lead to the conclusion that FHLBB made a counter-offer when it proposed a different forbearance period. *First Commerce*, 335 F.3d at 1381. "A reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer." *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 59 (1979). As both the *CalFed* and *First Commerce* courts stated, the "presence of the forbearance letter" distinguishes these cases from others where there are no "written documents articulating the government's agreement to provide favorable accounting treatment." *First Commerce,* 335 F.3d at 1381 (citations omitted); *CalFed*, 245 F.3d at 1347 ("[T]he FHLBB and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the Forbearance Letters."). In *First Commerce*, the court found that the initial offer/acceptance analysis did not go far enough and that the variation in the amortization terms proposed by the Bank Board constituted a counter-offer. *First Commerce,* 336 F.3d at 1381. In doing so, the court held that forbearance letters could demonstrate "contractual obligation by the government to recognize the supervisory goodwill and the amortization periods reflected in the letters." *Id.* The court defined a counter-offer as "[a] reply to an offer which purports to accept it but is conditional on the offeror's assent to terms additional to or different from those offered is not an acceptance but is a counter-offer." *Id.* (quoting RESTATEMENT (SECOND) OF CONTRACTS § 59 (1979).

In *Glass v. United States*, 44 Fed. Cl. 73, 76 (1999), *rev'd on other grounds*, 258 F.3d 1349 (Fed. Cir. 2001), this Court dealt with the issue of whether the parties contracted for special treatment of goodwill in the absence of any specific government documents relating to the issue of supervisory goodwill. In *Glass*, the government disputed the plaintiff's contention that the FHLBB had contracted for the amortization of goodwill over a lengthy period because no government document specifically granted this concession. *Id.* at 76. The FHLBB granted approval of the Application and Business Plan without specific mention of the treatment of goodwill but allowed the banks to account for the goodwill as envisioned in the Business Plan until the passage of FIRREA. *Id.* at 77. Therefore, the government argued, the FHLBB had not contracted to anything regarding goodwill but had merely allowed the amortization of goodwill as a gesture of "regulatory grace." *Id.* at 76. In finding the existence of a contract, the court held the plaintiffs had made an offer to acquire and recapitalize the bank in exchange for certain regulatory treatment, and the FHLBB accepted this offer as evidenced by the forbearance letters, the FHLBB resolution, and the subsequent regulatory treatment of the accounting of the goodwill. *Id.*

1st Home argues the situation in the present case is similar to that of *Glass*. Through the Forbearance Letter, FHLBB Resolution, and subsequent conduct, 1st Home asserts that the FHLBB made a counteroffer to 1st Home, incorporating into it all the provisions of the Application and Business Plan not specifically amended, including favorable treatment of supervisory goodwill. 1st Home argues that much like the instant case, the plaintiff in *Glass* conditioned the conversion on the favorable treatment of the supervisory goodwill and without it, the conversion would have been fruitless as the thrift would have immediately been out of regulatory compliance.

Additionally, 1st Home argues that the Application and accompanying Business Plan in conjunction with an internal FHLBB memoranda, the FHLBB Resolution, and the forbearance letter provide the "something more" required to demonstrate a contract as articulated by *D & N*, *Anderson*, and *First Commerce*. The Business Plan refers to the specific treatment of goodwill; for goodwill to be treated as an intangible asset, amortized over a 30 years. Ex. 5 at 242. The FHLBB Resolution provides that 1st Home is authorized to convert from the federal mutual to the federal stock form "in accordance with the terms of the application . . . ." Ex. 11 at 435. 1st Home additionally points to an internal FHLBB memoranda entitled 'Issues Paper' regarding the supervisory conversion ("Issues Memo"). In the Issues Memo, the FHLBB recognized that the conversion would generate a cash infusion by the investors of approximately $30 million and "will also involve the recognition of at least $48 million in goodwill through the use of push down accounting." Ex. 8 at 387. Furthermore, the Issues Memo recommended that the FHLBB approve of the Application and Business Plan, granting the requested regulatory concessions so as to alleviate the board of the burden of dealing with a thrift in the process of implosion.

The situation for 1st Home is complicated by the fact that the forbearance letter, Ex. 13, issued by the FHLBB expressly states that the Board would forbear from taking regulatory action pursuant to a § 563.13(d), governing minimum regulatory net worth requirements, provided that these deficiencies would not occur if 1st Home were allowed to calculate its net worth according to RAP (rather than GAAP). Ex. 13. The forbearance letter does not, however, make any reference

to goodwill, as was the case in *CalFed* or *First Commerce*. In these cases, the forbearance letter specially dealt with the contractual elements the plaintiffs sought to recover damages under. More generally, in *CalFed* and *First Commerce*, the forbearance letters point to something more than "a mere cloud" of contractual language. In *Anderson*, the court found a forbearance letter that did not mention goodwill and only contained standardized language requiring the accountants letter in the Resolution as indicative of the fact that the FHLBB had "not agreed to extend amortization of goodwill as part of the transaction." *Fifth Third*, 402 F.3d at 1231 (discussing why no contract was found in *Anderson*).

1st Home's situation is distinguishable from that of *D & N* and *Anderson* where the court found no contract existed between the parties. The FHLBB Resolution in this case contains similar standardized language regarding goodwill as in *Anderson*. But, the FHLBB acknowledged in the internal Issues Memo that the amortization of goodwill was a critical component of the proposed conversion. Without the specified goodwill treatment, the $30 million in capital contribution would not have been enough to move the bank away from the brink of insolvency. Further, had the conversion occurred without the favorable accounting treatment, the bank would have become immediately insolvent, nullifying the entire purpose of the conversion. The FHLBB was well aware of this fact. Unless the FHLBB consented to the terms governing the treatment of goodwill, as indicated by the Issues Memo, granting the conversion as an attempt to keep the bank solvent would have been pointless. The *Glass* court recognized a similar situation in that case, noting that "the transaction would have made no sense had [the bank] not been able to effect the guaranteed treatment of the goodwill." *Glass*, 44 Fed. Cl at 78. The court continued, "[t]o do so without a contractual guarantee would simply be irrational, and the only logical inference is that [the bank] planned to utilize the goodwill on its books, that the regulators understood this . . . and they agreed to this" in order to resolve the issue of the failing thrift. *Id.* As both the *CalFed* and *First Commerce* courts stated, the "presence of the forbearance letter" distinguishes these cases from others where there is no "written documents articulating the government's agreement to provide favorable accounting treatment." *First Commerce*, 335 F.3d at 1381 (citations omitted); *CalFed*, 245 F.3d at 1347 ("[T]he FHLBB and the FSLIC were contractually bound to recognize the supervisory goodwill and the amortization periods reflected in the Forbearance Letters.").

The Court finds that the FHLBB's forbearance letter, in combination with the approval and the Issues Memo, compose the government's offer of favorable accounting treatment thus constituting a counter-offer to 1st Home's application offer. Therefore, the Court finds that the government offered a counter-offer to 1st Home when it replied to 1st Home's Application and Business Plan and proposed new terms to those submitted.

The Court must now determine whether 1st Home accepted FHLBB's counter-offer. Normally, as the court in *First Commerce* opined, "counteroffers may be accepted by conduct." *First Commerce*, 335 F.3d at 1382 (citations omitted). Here, 1st Home converted from a mutual-base to a stock-based institution on October 31, 1986 and sold all of its stock to investors for a total cash infusion of $32.5 million thereby generating the capital contribution (approximately $30 million net after expenses) required for the conversion. Additionally, following the conversion closing on October 31, 1986, 1st Home addressed a number of the provisions include within FHLBB's

resolution. After the market-to-market of 1st Home's assets and liabilities had been completed and other purchase accounting adjustments had been made and documented, 1st Home's independent accountants reported the results in a letter, dated May 8, 1987, to FHLBB. Therefore, based on 1st Home's conduct in carrying out the Conversion as detailed in the Application and Business Plan, the Court finds that 1st Home unambiguously accepted FHLBB's counteroffer by its conduct.

### B. The Consideration

In this case, it is almost without dispute that the parties exchanged valuable consideration to support the contract. In *CalFed*, the court determined that the contract between the thrift and the FHLBB was supported by valuable consideration. *CalFed*, 245 F.3d at 1347 ("[T]he government bargained with Cal Fed to assume the net liability of the acquired thrifts in exchange for favorable regulatory consideration, allowing goodwill to be counted as an asset for regulatory capital purposes and to be amortized over 35 to 40 years."). Without the conversion and subsequent infusion, the parties were well aware that it was all but certain that 1st Home would collapse. In the event of a thrift's collapse, the FSLIC would have to step in and assume management of the thrift, at it's own expense, potentially having to liquidate 1st Home Federal. The *Winstar* cases recognized the savings conferred to the government, by not having to take over the ailing thrift, constituted consideration to support a contract. *See Winstar II*, 64 F.3d at 1542 ("Glendale consummated its merger with Broward on this understanding and in doing so saved the government hundreds of millions of dollars."). Therefore, the Court concludes that the contract between the FHLBB and 1st Home was supported by ample consideration.

### C. Actual Authority to Bind the United States

It is also clear that the FHLBB and the FSLIC have the authority to enter into contracts at issue in *Winstar* cases. *CalFed*, 245 F.3d at 1347 ("We have already answered the question of whether the FHLBB and the FSLIC have the authority to enter into contracts like these in the affirmative."); *Winstar II*, 64 F.3d at 1548 ("[T]he Bank Board and the FSLIC, as the principle regulators of the thrift industry, were fully empowered to enter into the contracts at issue here."). Thus, the Court finds that the defendant had the authority to enter into a contract with the plaintiff.

## III. Material Breach

Even though the Court has found a contract, the Government contends that 1st Home committed a prior material breach thus negating any liability. The Government relies on the testimony of its accountant expert, Walter K. Rush, III, that at the time the conversion closed, GAAP required that the entire amount of goodwill be amortized arising from its conversion on a level yield basis over 12 years, but it did not. Plaintiffs' assert that even if Mr. Rush were correct, not every departure from the terms of a contract is significant to be "material" relying on *Landmark Land Co. v. United States*, 44 Fed. Cl. 16, 18 (1999), *aff'd in part, rev'd in part*, 256 F.3d 1365 (Fed. Cir. 2001).

It is clear that the amount of goodwill need not be material for a regulatory capital contract

to exist. *See Southern California Federal Sav. & Loan v. United States*, 52 Fed. Cl. 531, 547-49 (2002) (rejecting government's argument that no contract existed because of the small goodwill amount), *see* note 12. Additionally, in *Landmark*, this Court held that:

> the fact is that the government contracted . . . for plaintiff to infuse capital . . . in order to improve the capital position of the failing thrifts [and] plaintiff[s] did so to the satisfaction of the regulators. That there are questions now [in Landmark about valuation of real estate contributed by plaintiff as part of the transaction] is irrelevant to the question of whether [plaintiff] satisfied its part of the bargain. It did and the government did not.

*Landmark*, 44 Fed. Cl. at 18. It appears to the Court that the Government argues on the one hand that goodwill was so immaterial to the deal that a contract was unnecessary, while on the other, that amortization of the same goodwill over 25 years on a straight-line basis (rather than on a level yield basis over 12 years) constitutes a material breach. The Court cannot see how the Government can have it both ways. Further, if the amortization term was material, the Board would have specified the term in the Resolution. Instead, the Board allowed the accountants to suggest an appropriate amortization period. Ex. 11 at 437.

## IV. Money-Back Restitution

### A. Standing to Sue

The Government argues that Plaintiffs' lack standing to seek restitution in this case because they must distribute the proceeds of the goodwill claim to the trust beneficiaries, not all of whom were original investors in the conversion. Plaintiffs respond that only a few current trust beneficiaries were not original investors. Plaintiffs further assert that anyone other than an original investor in 1st Home's conversion is not entitled to relief and if awarded money-back restitution will stipulate to the names of the original investors. It is clear, that only original investors or legal successors in interest have standing to recover. It is also clear that any original investor who still owned shares at the time of 1 Home's liquidation is a beneficiary of the Trust. Thus, the Plaintiffs must amend their complaint to include only original investors or legal successors in interest.

As a second argument, the Government asserts that because the Plaintiffs alleged in their complaint that 1st Home has a contract with FHLBB, but did not specifically spell out that the investors also had a contract, they are estopped from asserting the existence of a contract not pleaded in the complaint. This argument must fail. The Government has always known the role that the investors played in the 1st Home conversion since the transaction closed as the investors were named in the transaction documents. *See*, *e.g.* Ex. 20. The *Winstar*-related cases clearly have held that thrift plaintiffs are not entitled to restitution based on the liabilities assumed in the transaction but that investors of failed thrifts are entitled to money-back restitution. And, in this case, the Government has been on notice since the filing of the complaint that the investors are the real parties in interest with respect to the money-back restitution claims.

The Court finds that the original investors or legal successors in interest have standing to sue and, therefore, the Court **GRANTS** Plaintiffs leave to amend their complaint.

**B. No Material Breach as a Defense for Damages**

Lastly, the Government contends that Plaintiffs are not entitled to restitutionary recovery because they failed to prove that the Government caused their damages. Specifically, the Government asserts that "FIRREA had little, if any, effect upon 1st Home's regulatory compliance with the FHLBB regulations" thus, the Government is not liable for damages. Govt. Opp. at 20. Plaintiffs rely on *Mobil Oil Exploration & Producing Southeast, Inc. v. United States*, 530 U.S. 604 (2000), for their position that a plaintiff's entitlement to restitution for repudiation is so strong that it is available even where the breach "caused [plaintiff] no damage." *Id.* at 623. In *Mobil Oil*, the Supreme Court found that "the oil companies gave the United States $156 million in return for a contractural promise to follow the terms of pre-existing statues and regulations." *Id.* at 624. The Court further found that "[t]he new statute prevented the Government from keeping that promise" and that the breach 'substantially impair[ed] the value of the contract[s]." *Id.* (*citing* RESTATEMENT (SECOND) OF CONTRACTS § 243 (1979). Finally, the Court held that the Government must return the investment. *Id.*

Thus, even though the Government contends that the law did not *cause* damage by "repudiating" the contract, the breach substantially impaired the value of the contract. Indeed, the Supreme Court has held in *Winstar* that FIRREA "repudiated" thrift contracts for the regulatory treatment of goodwill. *Winstar*, 518 U.S. at 870 ("the government breached [the thrifts'] contracts when, pursuant to the new regulatory requirements imposed by FIRREA, the federal regulatory agencies limited the use of supervisory goodwill and capital credits in calculating [the thrift'] net worth"). Here, because of the breach, 1st Home was required to deduct $17 million immediately from its tangible capital. But for the breach, 1st Home would have been stronger by $17 million which, at the very least, would have lessened the impact of 1st Home's loan losses on its capital. *See* July 14, 1999, Jim Melvin Depo., Ex.39 at 818-19. The Court must reject the Government's argument that its breach was not "material" because it had no effect on 1st Home's ability to meet its capital requirements. *See Mobil Oil*, 530 U.S. at 621 (Even though the government's obligation at issue was only "the timely and fair consideration" of the oil companies exploration plans, not the companies' rights under the contract to explore for and develop oil, the breach was substantial enough to deprive the companies of their benefit of the bargain.). Thus, relying on *Mobil Oil*, the Court finds that the breach was substantial, as the breach deprived 1st Home of the benefit of its bargain. Therefore, the original investors or legal successors in interest are entitled to their $32.5 million back.

The Government next argues that if Plaintiffs are entitled to any money-back restitution, this amount must be offset by any benefits the Plaintiffs received from the contract. The Court, however, disagrees. Not unlike *Landmark Land Co., Inc*. 256 F.3d 1365, 1373 (Fed. Cir. 2001), the benefits cited by the Government are not benefits the Government provided under the contract. In *Landmark*, the Federal Circuit upheld the trial court's decision, holding that the plaintiffs were entitled to money-back restitution in the entire amount of their initial contribution without offset

because the "[d]efendant did not establish that any benefits that plaintiffs obtained in the form of dividends from Dixie Savings and Loan can be attributed to the Government. Once plaintiff acquired Dixie, its management of the company earned profits or incurred losses." *Id.* Applying this to the case at hand, it is clear that 1st Home did not obtain any benefit from the Government's contract, as they ultimately bore the entire risk of loss, assumed and paid all outstanding liabilities and liquidated the thrift at no cost to the Government. In support of this, Plaintiffs' expert, Dr. Horvitz explained that any residual assets left after 1st Home's liquidation resulted from 1st Home's management rather than from its contract with the Government. Horvitz Report, Ex. 38 at 754. Further, liquidation occurred one year later at absolutely no cost to the Government. *See* July 12, 1999, Jim Melvin Depo, Ex. 39 at 810-11. Had 1st Home not effected its own liquidation, the cost to the Government would have been at least $92.3 million, by the Government's own calculations. Thus, because the Government has not established any benefits that Plaintiffs obtained that can be attributed to the Government, the Plaintiffs are entitled to the return of their entire investment of $32.5 million, without offsets.

**CONCLUSION**

For the reasons set forth above, the Court finds that a contract existed between 1st Home and the FHLBB. The Court further finds that the FHLBB breached that contract. Therefore, the Court hereby **GRANTS** Plaintiffs' Motion for Summary Judgment as to Liability and Money-Back Restitution and **DENIES** Defendant's Cross-Motion for Summary Judgment and Motion to Dismiss for Failure to State a Claim upon which Relief can be Granted. The Court further finds that the original investors have standing to sue and, therefore, the Court **GRANTS** Plaintiffs leave to amend their complaint within 30 days from the date of this opinion. And finally, as the Court has granted Plaintiffs' money-back restitution claim, the Government must return to the original investors or legal successors in interest their original investment of $32.5 million, without any offsets. The Court will schedule a status conference to discuss any remaining issues with counsel.

**IT IS SO ORDERED.**

s/Loren A. Smith
Loren A. Smith
SENIOR JUDGE